**FILED**

January 07, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Christian Rodriguez_

DEPUTY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | | |
|---|---|---|
| **JUSTIN X. HALE** | § | |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | **CASE NO. <u>1:2024cv01076</u>** |
| | § | |
| **JAMIE MCGREGOR, DIRECTOR OF** | § | |
| **TRAINING & EDUCATION USA RUGBY** | § | |
| **AND** | § | |
| **USA RUGBY** | § | |
| *Defendants.* | § | |

---

**RESPONSE IN OPPOSITION TO USA RUGBY MOTION TO DISMISS**

---

Comes now, Plaintiff Justin X. Hale ("Plaintiff"), pro se, and files this Motion in Opposition to

Defendant USA Rugby's ("USAR") Motion to Dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6).

## I. INTRODUCTION

Plaintiff respectfully opposes USAR's Motion to Dismiss, as his First Amended Complaint

sufficiently pleads claims for tortious interference, retaliation under 42 U.S.C. § 1981, defamation,

breach of contract, and intentional infliction of emotional distress. These claims are supported by

detailed factual allegations that, if taken as true, plausibly entitle Plaintiff to relief.

Despite Plaintiff's extensive service as a rugby referee, USAR, through its agent Jamie McGregor, engaged in retaliatory and discriminatory actions that obstructed Plaintiff's professional opportunities. USAR's motion is legally flawed, relying on incorrect assertions regarding preemption under the Ted Stevens Act and Plaintiff's standing as an independent contractor. Plaintiff's pleadings demonstrate that:

- USAR willfully interfered with his professional opportunities,

- USAR retaliated against him for officiating NCR events, and

- Plaintiff suffered significant professional and emotional harm.

Given the sufficiency of Plaintiff's allegations, he respectfully requests that the Court deny USAR's Motion to Dismiss and allow the case to proceed to discovery.

## II. FACTUAL BACKGROUND

Plaintiff Justin X. Hale is a highly qualified rugby referee with years of experience officiating matches at various levels of competitive play. Over the course of his career, Plaintiff has earned a reputation for professionalism and skill in refereeing high-profile rugby events.

### A. Initial Disqualification from CRAA 7s Championship

On April 26, 2023, Plaintiff was confirmed by Nick Ricono, USA Rugby 7s Referee Manager, to officiate at the prestigious CRAA 7s Championship. The confirmation was welcomed and acknowledged through an official email stating appreciation for Plaintiff's acceptance and participation (Exhibit A). However, this opportunity was abruptly rescinded. On May 1, 2023, mere days before the

event, Defendant McGregor informed Plaintiff of his disqualification during a phone call, citing Plaintiff's prior involvement in events organized by the National Collegiate Rugby (NCR), a competing rugby organization.

This exclusion was based on an alleged but undocumented agreement between CRAA and USA Rugby, which Plaintiff had never been made aware of. McGregor's refusal to provide written proof of this agreement or clear guidelines for reinstatement, coupled with threats of further exclusion from USA Rugby events, exemplifies a clear abuse of power and discriminatory practice. This act severely damaged Plaintiff's professional reputation and resulted in substantial financial losses.

**B. Continued Pattern of Discriminatory Actions**

The exclusion from the CRAA 7s Championship represents a component of a broader, systematic pattern of discrimination perpetuated by Defendant McGregor. This pattern manifests in consistent barriers placed against Plaintiff's opportunities to officiate in Major League Rugby (MLR) and other prestigious rugby events. Notably, these barriers are recurrently attributed to Plaintiff's associations with NCR events, despite the lack of any explicit policy that precludes such involvement.

This discriminatory pattern is further exemplified by the treatment of white referees who also participated in similar NCR events but did not experience comparable punitive measures. Contrarily, these referees were permitted to continue their officiating roles without impediment and were subsequently promoted within USA Rugby's ranks, thus underscoring a clear bias that disproportionately disadvantages Plaintiff.

**C. Professional and Emotional Harm**

As a direct result of USAR's and McGregor's actions, Plaintiff suffered significant professional and personal harm. The arbitrary exclusion from officiating events deprived Plaintiff of valuable career opportunities, financial compensation, and professional development. Additionally, the ongoing retaliatory conduct created an environment of uncertainty, anxiety, and emotional distress, severely impacting Plaintiff's mental well-being and professional standing within the rugby community.

## III. ARGUMENTS

**A. The Ted Stevens Act Does Not Preempt Plaintiff's State Law Claims.**

Defendant USA Rugby erroneously argues that Plaintiff's state law claims are preempted by the Ted Stevens Act and the Act's administrative dispute resolution process. This argument misinterprets the scope of the Ted Stevens Act, which governs eligibility disputes and governance decisions within national governing bodies (NGBs) but does not extend to civil rights violations or tortious conduct unrelated to sport-specific eligibility.

Defendant relies on *Pliuskaitis v. USA Swimming, Inc.*, a case involving a coach's eligibility under USA Swimming's rules, to support its preemption argument. However, Defendant's reliance on Pliuskaitis is misplaced. In Pliuskaitis, the plaintiff's claims arose directly from USA Swimming's eligibility rules and the NGB's authority to regulate participation in its sport, matters squarely within the scope of the Ted Stevens Act. Consequently, the court found those claims preempted because they concerned a core governance function of an NGB.

In contrast, Plaintiff's claims do not hinge on eligibility or participation rules established by USA Rugby. Instead, Plaintiff alleges that Jamie McGregor, acting as an agent of USA Rugby, orchestrated a deliberate and targeted campaign to harm his professional career and reputation. This campaign included: Intentional interference with Plaintiff's existing and prospective business relationships, Defamatory statements intended to damage Plaintiff's professional standing, and Retaliatory conduct in response to Plaintiff's participation in events hosted by a competing rugby organization (NCR).

These claims extend beyond mere governance or eligibility issues and are grounded in tort and civil rights law. Plaintiff's allegations involve malicious, discriminatory, and retaliatory actions that caused significant professional and emotional harm, matters which fall outside the administrative dispute resolution framework established by the Ted Stevens Act. Plaintiff's claims for racial discrimination and retaliation under § 1981 assert violations of his fundamental right to engage in professional relationships free from racial discrimination, a right protected by federal law and squarely within the jurisdiction of this Court.

Defendant USA Rugby's preemption argument fundamentally mischaracterizes the nature of Plaintiff's claims. Unlike cases involving eligibility or governance disputes governed by the Ted Stevens Act, Plaintiff's claims concern traditional torts and civil rights violations, which are not subject to the Act's preemptive scope. Therefore, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss with respect to preemption and allow his state law claims to proceed.

**B. Plaintiff Has Adequately Pled the Elements of Tortious Interference.**

Defendant USA Rugby argues that Plaintiff's tortious interference claim fails because McGregor did not directly control referee assignments for MLR or CRAA. This argument is flawed, as it overlooks a crucial fact: USA Rugby partially funds the MLR Referee Manager's contract, giving USA Rugby, through McGregor, significant influence over MLR officiating assignments.

Additionally, Defendant contends that Plaintiff has not identified specific contracts that were interfered with. This argument lacks merit. Plaintiff's Amended Complaint, supported by the transcript of a phone conversation with Jamie McGregor, demonstrates a consistent and deliberate effort to hinder Plaintiff's officiating opportunities at high-profile events. These opportunities, including the CRAA Championships and Major League Rugby (MLR) matches, represent valid and identifiable business relationships and professional expectations.

Contrary to Defendant's assertion, USA Rugby does not typically formalize officiating assignments through written contracts. Instead, the organization relies on verbal agreements and email confirmations, a well-established practice in the rugby community. Plaintiff's officiating assignments, including the invitation to officiate at the CRAA Championships on March 13, 2024, were confirmed through these informal methods. Although there was no formal written contract, these arrangements created valid professional expectations protected under Texas law from improper interference.

Under Texas law, the elements of tortious interference with an existing contract or valid business relationship are: Existence of a Contract or Valid Business Relationship, Willful and Intentional Interference, Proximate Cause of Damages, Actual Damages.

**Existence of a Contract or Valid Business Relationship** : While Plaintiff acknowledges that he was not an employee of USA Rugby and did not have formal written contracts, Texas law recognizes that valid business relationships or at-will agreements can be protected from tortious interference. Courts have consistently held that interference with business relationships, even those based on informal agreements or verbal commitments, is actionable if the interference was intentional and resulted in harm.

The phone transcript clearly demonstrates McGregor's knowledge of Plaintiff's existing business relationships and his professional expectations for officiating assignments. Specifically, McGregor acknowledged Plaintiff's anticipated officiating roles and explicitly threatened to block Plaintiff's participation in future events unless he ceased officiating for NCR. These facts are sufficient to establish the existence of valid business relationships subject to protection under tort law.

**Willful and Intentional Interference:** McGregor's conduct, as outlined in the phone transcript, was willful and deliberate. He explicitly stated that Plaintiff would be excluded from officiating assignments, including MLR matches and CRAA events, solely because of his participation in NCR events. This demonstrates a clear intent to disrupt Plaintiff's professional relationships and officiating opportunities.

**Proximate Cause of Damages**: McGregor's intentional interference directly caused Plaintiff's exclusion from multiple officiating opportunities. But for McGregor's actions, Plaintiff would have officiated in high-profile events, including the CRAA Championships and MLR matches. The phone transcript, along with Plaintiff's Amended Complaint, provides specific evidence linking McGregor's actions to the harm suffered by Plaintiff, satisfying the proximate cause element.

**Actual Damages**: As a direct consequence of McGregor's interference, Plaintiff suffered substantial financial harm, including lost income from officiating assignments, as well as reputational damage within the rugby community. The exclusion from high-profile events tarnished Plaintiff's professional standing and significantly hindered his career progression as a referee.

**Conclusion on Tortious Interference**

Plaintiff has adequately pleaded the elements of tortious interference by detailing specific facts and providing evidence, including the phone transcript and documented lost officiating opportunities. Defendant USA Rugby's argument that formal contracts are required is unfounded, given that officiating assignments within USA Rugby are commonly arranged through verbal agreements and email confirmations.

**C. Plaintiff Was Not an Employee of USA Rugby, But Can Still Claim Retaliation.**

Defendant USA Rugby correctly notes that Plaintiff was not a direct employee of USA Rugby. However, retaliation claims are not exclusively limited to traditional employer-employee relationships. Courts have recognized that retaliation can occur in contexts where a party exerts significant control

over another's professional opportunities, even in the absence of formal employment. Plaintiff's Amended Complaint details a series of retaliatory actions taken by Jamie McGregor, acting as an agent of USA Rugby, directly in response to Plaintiff's officiating at NCR events.

**Retaliatory Actions and Clear Motive**: Plaintiff alleges that McGregor's conduct constituted a deliberate effort to punish him for officiating at NCR events. McGregor's statements during the phone calls in May 2023 and March 2024 explicitly link Plaintiff's exclusion from high-profile officiating opportunities—including the CRAA Championships, Major League Rugby (MLR) matches, and other significant events—to his NCR participation. Specifically, McGregor warned Plaintiff that his continued involvement with NCR events would lead to exclusion from future USA Rugby-sanctioned assignments. These statements reveal a clear retaliatory motive.

Additionally, USA Rugby's financial relationship with MLR, in which it partially funds the MLR Referee Manager's contract, underscores McGregor's significant influence over MLR referee appointments. This financial arrangement allowed McGregor, acting on behalf of USA Rugby, to exercise leverage over Plaintiff's professional opportunities in MLR, further demonstrating his ability to retaliate against Plaintiff.

**Control Over Professional Opportunities:** While Plaintiff was not an employee of USA Rugby, McGregor, in his capacity as Director of Training & Education, exercised substantial control over Plaintiff's access to officiating assignments and professional advancement within the rugby community. McGregor's authority over referee appointments for high-profile events gave him the ability to effectively retaliate against Plaintiff by excluding him from opportunities. This level of control over

9

Plaintiff's professional opportunities is sufficient to establish a retaliation claim, even absent a formal employment relationship.

**Legal Basis for Retaliation Claims Outside of Employment**: Courts have acknowledged that *42 U.S.C. § 1981* protects not only traditional employees but also independent contractors and others engaged in professional relationships. Section 1981 guarantees the right to make and enforce contracts free from racial discrimination and retaliation. Plaintiff's professional relationship with USA Rugby, though informal, created legitimate business expectations, including opportunities to officiate at events that McGregor directly interfered with. By retaliating against Plaintiff for his participation in NCR events, McGregor and USA Rugby violated Plaintiff's rights under § 1981.

**Conclusion on Retaliation**

Plaintiff has adequately pled a claim for retaliation by providing detailed factual allegations and evidence of McGregor's retaliatory actions, which were directly linked to Plaintiff's participation in NCR events. Defendant USA Rugby's argument that Plaintiff's claim fails because he was not an employee is unavailing, as retaliation claims under § 1981 extend beyond formal employment relationships to include professional and contractual relationships subject to improper interference. Furthermore, McGregor's significant control over Plaintiff's officiating opportunities, bolstered by USA Rugby's financial relationship with MLR, underscores his ability to retaliate against Plaintiff.

**D. Plaintiff Has Sufficiently Pled Defamation**

Defendant USA Rugby contends that Plaintiff has not provided sufficient detail regarding the alleged defamatory statements. However, Plaintiff's Amended Complaint and supporting evidence, including the phone transcript (Exhibit B), provide enough factual detail to infer the existence of false and damaging statements made by McGregor, acting as an agent of USA Rugby, to third parties within the rugby community.

**False and Damaging Statements**: Plaintiff alleges that McGregor made statements to officials and organizations in the rugby community, including those affiliated with CRAA and MLR, that implied Plaintiff was: Unprofessional, Not a team player, and Unfit for officiating assignments due to his participation in NCR events.

While Plaintiff does not yet possess a verbatim record of these specific defamatory statements, the inference of publication arises from the exclusion Plaintiff experienced after McGregor's communications with rugby organizations. The timing of Plaintiff's exclusion from CRAA, MLR, and other high-profile events directly following his participation in NCR events, coupled with McGregor's control over officiating appointments, supports the reasonable inference that McGregor made disparaging statements about Plaintiff to third parties. Courts have recognized that, in the absence of direct evidence, circumstantial evidence and inferences can suffice to plead publication in defamation claims.

**Publication and Harm**: McGregor's statements were published to third parties, specifically officials and organizations within the rugby community who had the authority to appoint referees. As a result

of these statements, Plaintiff suffered significant reputational harm, leading to lost officiating assignments and financial injury. Plaintiff was excluded from refereeing prestigious events, including CRAA Championships and MLR matches, which negatively impacted his standing within the rugby community.

**Actionable Defamation Under Texas Law**: Under Texas law, defamatory statements that harm a professional's reputation and standing are actionable. As the Texas Supreme Court held in Hancock v. Variyam, "A statement is defamatory if it tends to injure a person's reputation and expose that person to public hatred, contempt, or ridicule, or financial injury." (Hancock v. Variyam, 400 S.W.3d 59, 66 (Tex. 2013)). McGregor's alleged statements, implying that Plaintiff was unprofessional and acting contrary to USA Rugby's interests, directly impugned Plaintiff's reputation as a referee.

Moreover, statements that harm an individual's ability to earn a livelihood are considered defamation per se under Texas law. Plaintiff's exclusion from officiating assignments directly affected his income and professional prospects, making these statements actionable without requiring proof of specific damages.

**Sufficient Specificity for Pleading**: While Plaintiff acknowledges that he does not currently have direct evidence of the precise wording of McGregor's statements, Texas courts have held that defamation claims may be based on the reasonable inference of publication and harm, especially where the plaintiff is excluded from professional opportunities shortly after defamatory statements are believed to have been made. Plaintiff has provided sufficient circumstantial evidence, including the timeline of events and McGregor's role in controlling officiating assignments, to support a plausible claim of defamation.

**Conclusion on Defamation**

Taken together, the allegations in Plaintiff's Amended Complaint, supported by phone transcription and emails with the Director of Rugby Referees David Wilkerson, provide enough factual detail and circumstantial evidence to infer the existence of false and damaging statements made by McGregor to third parties within the rugby community. These statements directly harmed Plaintiff's professional reputation and resulted in exclusion from officiating assignments, causing both financial and reputational injury.

**E. Plaintiff Has Sufficiently Pled Racial Discrimination**

Plaintiff has sufficiently pled a claim for racial discrimination under 42 U.S.C. § 1981, which guarantees all individuals the right to make and enforce contracts free from racial discrimination. Plaintiff's allegations detail specific facts demonstrating that Defendant McGregor, acting on behalf of USA Rugby, engaged in discriminatory conduct that resulted in Plaintiff's exclusion from officiating opportunities, causing financial and reputational harm.

**Protected Class**: Plaintiff is a Black man, a member of a protected class under 42 U.S.C. § 1981. This statute ensures that all individuals, regardless of race, have an equal right to participate in professional relationships and business opportunities without discrimination.

**Integral Service Provider**: Although Plaintiff was classified as an independent contractor, he provided an essential service to USA Rugby by officiating rugby matches. Courts have consistently held that § 1981 applies to independent contractors and protects against racial discrimination in

professional and contractual relationships. Plaintiff's role as a referee was integral to the functioning of USA Rugby's competitions, making his exclusion from officiating assignments a significant professional injury.

**Adverse Actions**: Plaintiff was subjected to multiple adverse actions as a direct result of McGregor's conduct. These actions included exclusion from: The CRAA Championships, Major League Rugby (MLR) matches, and Other high-profile officiating opportunities, resulting in a substantial loss of income, professional exposure, and career advancement opportunities. Plaintiff's exclusion from these events directly harmed his professional standing within the rugby community and prevented him from continuing to build his career as a high-level referee.

**Differential Treatment**: Plaintiff has alleged facts showing that similarly situated individuals, who were not Black, continued to officiate USA Rugby events without facing similar restrictions or exclusions. Despite having comparable experience and qualifications, these referees—who also participated in NCR events—were not subjected to the same punitive actions by McGregor or USA Rugby. This differential treatment, in which only Plaintiff was excluded while white referees continued to receive appointments and even promotions, supports an inference of racial discrimination.

**Lack of Legitimate Explanation:** Defendant McGregor and USA Rugby have failed to provide a legitimate, non-discriminatory reason for Plaintiff's exclusion. The absence of any documented policy prohibiting referees from officiating NCR events, combined with McGregor's explicit threats and subsequent exclusion of Plaintiff, further supports the allegation that Plaintiff's race was a motivating factor in the adverse actions taken against him. Courts have recognized that when a defendant cannot

offer a legitimate explanation for differential treatment, this strengthens the inference of discriminatory intent.

**Conclusion on Racial Discrimination**

Taken together, Plaintiff's allegations establish a plausible claim for racial discrimination under 42 U.S.C. § 1981. Plaintiff has demonstrated that he belongs to a protected class, provided essential services to USA Rugby, suffered adverse actions resulting in professional and financial harm, was treated differently from similarly situated non-Black referees, and that Defendant has failed to offer any legitimate, non-discriminatory justification for his exclusion. These facts, if taken as true, entitle Plaintiff to relief under the statute.

**F. Duran and Broussard Are Inapplicable to Plaintiff's Claims**

Defendant USA Rugby's reliance on *Duran v. City of Corpus Christi* and *Broussard v. L.H. Bossier, Inc*. is misplaced, as both cases involve distinguishable legal frameworks and factual contexts. In Duran, the plaintiff's retaliation claim was dismissed due to lack of standing, as his injury was deemed indirect and derivative of his employer's loss of a contract. In contrast, Plaintiff had a direct professional relationship with USA Rugby, receiving appointments to officiate significant events such as the CRAA Championships and MLR matches. McGregor's actions directly targeted Plaintiff, causing him personal and direct harm, including lost income and reputational damage. Moreover, Plaintiff's claims arise under *42 U.S.C.* § 1981, which addresses racial discrimination and retaliation in professional relationships, unlike the First Amendment claim at issue in Duran.

Similarly, in Broussard, the court dismissed a Title VII claim because the statute applies only to employees, and the plaintiff was deemed an independent contractor. However, § 1981 explicitly protects independent contractors from racial discrimination and retaliation in contractual relationships. Unlike the plaintiff in Broussard, Plaintiff here was subject to significant control by Defendant USA Rugby and its agent, Jamie McGregor, who influenced Plaintiff's officiating assignments and career advancement.

Both cases cited by Defendant are inapplicable because Plaintiff has pled facts demonstrating direct harm, interference with his professional relationships, and retaliation, all of which are actionable under § 1981, regardless of employment status.

For these reasons, Defendant's reliance on Duran and Broussard is unpersuasive, and Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss and allow this case to proceed to discovery.

**G. Plaintiff's Breach of Contract Claim Should Not Be Dismissed Without Further Discovery.**

Defendant USA Rugby argues that Plaintiff's breach of contract claim should be dismissed because McGregor was not a direct party to Plaintiff's contracts with other organizations. While Plaintiff acknowledges that McGregor did not have a direct contractual relationship with him, the transcript of the phone call clearly demonstrates that McGregor was aware of Plaintiff's existing and prospective officiating contracts and intentionally acted to disrupt them.

Additionally, USA Rugby pays a portion of the MLR Referee Manager's contract, indicating that McGregor, as an agent of USA Rugby, had influence over MLR officiating decisions. This financial arrangement gives USA Rugby, through McGregor, a say in referee appointments for MLR matches, further supporting Plaintiff's claim that McGregor acted to disrupt Plaintiff's contracts and professional opportunities with MLR.

McGregor's explicit statements linking Plaintiff's exclusion from key officiating opportunities to his participation in NCR events provide a factual basis for the claim that McGregor knowingly interfered with Plaintiff's contractual obligations. The alleged interference, which resulted in Plaintiff's exclusion from events such as the CRAA Championships and Major League Rugby (MLR) matches, directly prevented Plaintiff from fulfilling existing contracts and securing future assignments. This type of interference, when carried out with knowledge of the contractual obligations, can constitute a breach of contract claim or, at minimum, provide grounds for a claim of tortious interference with contractual relations.

Furthermore, at the motion to dismiss stage, the Court must accept the factual allegations in Plaintiff's Amended Complaint as true and construe them in the light most favorable to Plaintiff. Without the benefit of discovery, dismissing Plaintiff's breach of contract claim would be premature. Discovery could uncover additional evidence regarding McGregor's influence over referee appointments and interference with Plaintiff's officiating assignments and contracts, which would further substantiate the claim.

**H. Futility of Exhausting Administrative Remedies**

Defendant argues that Plaintiff failed to exhaust administrative remedies before filing this lawsuit. However, Plaintiff made repeated good-faith attempts to resolve these issues internally within USA Rugby's administrative structure, but those efforts proved futile.

Plaintiff raised concerns about the unfair and potentially unlawful nature of McGregor's actions directly with McGregor himself, who, as Director of Training & Education at USA Rugby, held significant influence over officiating appointments. Plaintiff also voiced his concerns to other key individuals in USA Rugby's leadership circle, including Nick Ricono, Rosalind Anderson, Chair of the RLC Development Working Group, and David Wilkinson, who instructed Plaintiff to speak directly with McGregor. Despite these efforts, Plaintiff was consistently met with resistance, and McGregor's conduct was defended by those in leadership positions.

Additionally, Plaintiff participated in a video call with McGregor, mediated by Marquise Goodwin, in an attempt to reach a resolution. However, this process did not result in any meaningful resolution of Plaintiff's concerns. The repeated insistence by McGregor's leadership circle that McGregor's actions were appropriate rendered further pursuit of administrative remedies futile.

Under these circumstances, where the individuals involved in the grievance process were the same individuals responsible for the alleged misconduct, it is unreasonable to require further exhaustion of administrative remedies, particularly when the process is controlled by those alleged to have committed the wrongdoing.

Therefore, Plaintiff respectfully requests that the Court find that Plaintiff's efforts to address these issues internally were sufficient and that further exhaustion of administrative remedies is not required.

## I. Remaining Claims

Should the court grant the Motion for Leave to file a Second Amended Complaint, Plaintiff is prepared to furnish detailed factual allegations and comprehensive legal arguments in support of each additional claim. This preparedness stems from a belief that the facts of this case robustly support these claims, and that their inclusion in an amended complaint would facilitate a more streamlined and focused litigation process.

Including these claims will not only allow the court to have a fuller understanding of the context and breadth of the issues at hand but will also enhance the efficiency of judicial proceedings by consolidating all pertinent allegations and arguments into a single, comprehensive document. This approach ensures that all claims are addressed thoroughly and with due consideration, aligning with judicial efficiency and the interests of justice.

Plaintiff is committed to providing a well-substantiated presentation of each claim, grounded in both fact and law, to aid the court in its deliberations and to ensure that all relevant aspects of the case are fully explored and adjudicated.

**III. Conclusion**

Plaintiff respectfully requests that the Court deny Defendant USA Rugby's Motion to Dismiss in its entirety. As a *pro se* litigant, Plaintiff asks the Court to consider his self-represented status. Despite not having formal legal representation, Plaintiff has presented a well-founded case with detailed factual allegations and supporting evidence, including the phone transcript and emails, which directly demonstrate McGregor's intent to harm Plaintiff's professional relationships.

Plaintiff's Amended Complaint sufficiently pleads claims for tortious interference, retaliation under 42 U.S.C. § 1981, defamation, racial discrimination, and breach of contract, with plausible allegations of significant financial and emotional harm. Dismissing these claims at this stage would deny Plaintiff the opportunity to seek justice.

For these reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss and allow this case to proceed to discovery.

Dated: January 7, 2025

Respectfully submitted,

*/s/ Justin X. Hale*
Justin X. Hale
2904 Sprouted Grain
Seguin, TX
(979) 703-0894

## <u>CERTIFICATE OF SERVICE</u>

I certify that on ⟨Jan 7, 2025⟩, I electronically filed the foregoing with the Clerk of the Court using the Electronic Submission For Pro Se Filers, and mailed a copy of the foregoing on ⟨Jan 7, 2025⟩ to:

Philip Robert Brinson
1900 West Loop South, Suite 1000
Houston, Texas 77027
prbrinson@grsm.com

*/s/ Justin X. Hale*

Justin X. Hale

2904 Sprouted Grain

Seguin, TX

(979) 703-0894

justinxhale@gmail.com
